IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | |
|---|---|
| In re:<br>KEMPES JEAN<br>LORI LEE JEAN,<br><br>  Debtors.<br>_____<br><br>KEMPES JEAN<br>LORI LEE JEAN<br>22 Tygart Court<br>Gaithersburg, Maryland 20879<br><br>  and<br><br>GARY ROSEN, CHAPTER 7 TRUSTEE<br>13017 Wisteria Drive #327<br>Germantown, Maryland 20874<br><br>  Plaintiffs<br><br>v.<br><br>SARI KURLAND<br>211 Jersey Lane<br>Rockville, Maryland 20814<br><br>  and<br><br>THE LAW OFFICES OF SARI KURLAND, PC<br>211 Jersey Lane<br>Rockville, Maryland 20814<br><br>  Defendants. | Case No. 20-10883-LSS<br><br>(Chapter 7)<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Adv. No. |

COMPLAINT

Plaintiffs Kempes Jean ("Mr. Jean") and Lori Jean ("Ms. Jean," collectively the "Jeans"),

and Gary Rosen, Chapter 7 Trustee of the Bankruptcy Estate of Kempes and Lori Lee Jean

(the "Trustee" or "Mr. Rosen"), through their undersigned counsel, file this complaint against

Defendants Sari Kurland ("Ms. Kurland") and The Law Offices of Sari Kurland, PC (the "Firm"), and in support thereof, states as follows.

## THE PARTIES AND VENUE

1.  The Jeans are residents of the State of Maryland.

2.  Gary Rosen is the Chapter 7 Trustee of the Bankruptcy Estate of Kempes and Lori Lee Jean in the United States Bankruptcy Court for the District of Maryland, Case No. 20-10883.

3.  Upon information and belief, Ms. Kurland is a resident of the State of Maryland.

4.  The Firm is a Maryland professional corporation with its principal place of business located in Maryland.

5.  Upon information and belief, at all times relevant hereto, Ms. Kurland was an employee and/or agent, actual or apparent, of the Firm.

6.  This Court is vested with jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and United States District Court Local Rule 402.  Further, this adversary proceeding is a "core" proceeding pursuant to the provisions of 28 U.S.C. § 157(b)(2)(F).

7.  Venue in this Court is appropriate pursuant to the provisions of 28 U.S.C. § 1409(a).

8.  Pursuant to the provisions of Local Bankruptcy Rule 7012-1(b), Plaintiffs hereby consent to the entry herein by this Court of final orders as contemplated in 28 U.S.C. § 157(c)(2).

## FACTUAL BACKGROUND

9.  In February or March 2019, the Jeans hired Defendants to purse protection from creditors under the United States Bankruptcy Code.

10. The Jeans provided their financial information to Defendants at that time.

11. Defendants failed to have the Jeans execute an engagement agreement for their services.

12. Defendants failed to explain to the Jeans the manner in which Defendants would bill for their services and the fee arrangement.

13. Defendants failed to explain to the Jeans the difference between pre-petition services, services to be provided post-petition, and the manner in which those services would be billed and expected to be paid. Defendants represented the Jeans post-petition against the Jeans' creditors while Defendants were also creditors with a conflict of interest.

14. The Jeans received requests for payments from Defendants via email or text. The Jeans paid by cash and debit card.

15. The Jeans paid to Defendants at least $8,000. Defendants asked the Jeans to pay what they owed to Defendants but were unable to identify what sum was owed upon request.

16. The Jeans advised Defendants that the most important goal was that they not lose their home.

17. Defendants told the Jeans that they would not lose their home. The Jeans lived in their home with their 4 children.

18. On or about June 7, 2019, Jack Fisher, Ms. Jean's father, obtained a judgment against Mr. Jean and Ms. Jean in the amount of $43,657.00 (the "Fisher Judgment"). Defendants had actual knowledge of the Fisher Judgment prior to the petition date because Defendants represented a tenant in respect of the Fisher Judgment.

19. The Fisher Judgment was a lien against the Jeans' Montgomery County home, located at 19300 Erin Tree Court, Gaithersburg, Maryland  20879.

20. Defendants filed the Jeans' Bankruptcy Petition in January 2020, which Petition was based on information provided to Defendants in early 2019.

21. Notwithstanding that the Jeans had been providing Defendants with information for months, Defendants failed to review the schedules with the Jeans before the filing of the petition.

22. Defendants filed for protection under Chapter 7 of the Bankruptcy Code, which is a liquidation of assets.

23. Defendants did not discuss with the Jeans the risks and benefits of filing a Chapter 7 Bankruptcy Petition versus a Chapter 13 Bankruptcy Petition.

24. Ms. Kurland identified a substantial number of debts as joint debts that were not joint debts.

25. On February 13, 2020, Defendants filed on the Jeans behalf Amended Summary of Assets and Liabilities.

26. By email dated March 5, 2020, Mr. Rosen advised Ms. Kurland that his real estate agent valued the Jeans' home at between $750,000 and $800,000, substantially more that the value provided in the Jeans' bankruptcy filings.  Mr. Rosen advised Ms. Kurland that he would be moving forward with selling the Jeans' home because there is significant equity.

27. In a Chapter 7 Bankruptcy, the trustee can sell real property held by husband and wife as tenants by the entirety to satisfy unsecured creditors to which the husband and wife are jointly liable.

28. Ms. Kurland failed to advise the Jeans that Mr. Rosen believed the Jeans' home to be worth between $100,000 to $150,000 more than the Jeans indicated in their petition and intended to sell their home.

29. Upon information and belief, Ms. Kurland utilized a real estate agent with whom she had transacted business and from whom she had received compensation to provide an estimate of the value of the Jeans' home, which was below market value.

30. Ms. Kurland failed to obtain an independent appraisal of the Jean's home in response to Mr. Rosen's assertions of value.

31. On March 10, 2020, after the bankruptcy filing, Defendants asked for the Jeans' credit reports.

32. On March 10, 2020, for the first time, Defendants advised the Jeans that the Jeans needed to confirm which debts were joint and which debts were separate.

33. On March 13, 2020, Mr. Rosen filed an application to hire a real estate agent in connection with his contemplated sale of the Jeans' home.

34. On March 16, 2020, Defendants emailed the Jeans stating that she had reviewed the credit reports and determined which debts were joint and which were separate, with the exception of four creditors.

35. On March 18, 2020, Defendants filed an Amended Summary of Assets and Amended Schedule E/F (Creditors Who Have Unsecured Claims) on behalf of the Jeans.

36. By email dated March 19, 2020, Ms. Kurland advised Mr. Rosen that the Jeans have no joint unsecured debts, except income taxes.  She further advised Mr. Rosen that the Jeans' timeshare debt and debt to Mr. Fisher were secured debts.

37. By email dated March 19, 2020, Mr. Rosen advised Ms. Kurland that there were a number of joint unsecured creditors, including taxes, the timeshare, and Jack Fisher.  Mr. Rosen advised Ms. Kurland that the lien arising from the judgment entered against the Jeans in favor of Mr. Fisher was a preference that was avoidable  under the Bankruptcy Code because the Jeans' bankruptcy petition was filed earlier than one year from the date of the Fisher Judgment. Upon avoidance of the judgment lien,  Mr. Fisher's debt would become a joint unsecured debt.

38. Defendants failed to communicate the substance and significance of Mr. Rosen's March 19, 2020 email with the Jeans.

39. By email dated March 25, 2020, Ms. Kurland wrote to Mr. Rosen: "As previously stated and demonstrated, there are no joint unsecured debts with the exception of the income taxes. With respect to the time share it is secured and the debt to Fisher is as well.  If you want to work something out with me to settle your claim we can talk, but if you insist on selling the home I will be filing tomorrow an opposition to your motion to employ realtor and depending on the outcome possibly convert to a Chapter 13 case."

40. By email dated March 25, 2020, Mr. Rosen responded: "The timeshare is undersecured. – they also have an unsecured claim.  The claim to Fisher arises out of a judgment lien.  That lien is preferential.  It will clearly be set aside after I file my Complaint.  There are also joint taxes owed.  It's your prerogative to convert to a Chapter 13."

41. Defendants never discussed with the Jeans the substance or significance of Mr. Rosen's March 25, 2020 email or the benefits of and risks of failing to convert to a Chapter 13 case.

42. On March 27, 2020, Defendants filed an Objection to Mr. Rosen's application to employ a real estate agent.

43. In the Objection, Defendants stated that the Jeans' home was owned as tenants by the entirety and therefore not included in the Bankruptcy Estate.

44. In the Objection, Defendants noted an exception to the general rule, which is that property held as tenants by the entirety can be sold "if there are unsecured debts jointly owned by married Debtors."

45. Defendant represented to the Court that the only unsecured joint debt was priority income tax debt.

46. Defendants also stated, without securing an independent appraisal of the property, that the estimated value of the Jeans' residence was between $567,300 - $672,800, based upon the

opinion of Ms. Kurland's  friend who was a real estate agent with whom, upon information and belief, she had transacted business and from whom she had received compensation.

47. Defendants also claimed in the Objection that Mr. Rosen allegedly "failed and refused to respond to [Defendants'] many attempts to reach out and settle any claims he may have against the Estate . . ."

48. On June 15, 2020, Mr. Rosen filed a Complaint to avoid the judgment and lien of Ms. Jean's father - Jack Fisher.

49. Defendants knew or should have known that Mr. Fisher's secured lien was avoidable. Consequently, Mr. Fisher's debt would become a joint unsecured debt, which could be satisfied by selling the Jeans' home.

50. On June 17, 2020, Mr. Rosen filed a response to Defendants' objection to Mr. Rosen's application to employ a real estate agent.

51. In his response, Mr. Rosen states that the Jeans' property "has significant equity."

52. Mr. Rosen also advised the Court that on February 4, 2020, the Jeans filed under penalties of perjury, sworn Schedules identifying approximately 18 joint unsecured creditors.

53. Mr. Rosen also noted that even if the 17 of the creditors were not joint, the debt owed to Mr. Fisher "will be determined to be a joint unsecured debt."

54. Defendants knew or should have known that had the petition been filed one year after the Fisher's judgment was entered, it would have been unavoidable and their home not available to satisfy joint unsecured debt.

55. By email dated June 22, 2020, Defendants forwarded to the Jeans Mr. Rosen's complaint and response to the Jeans' objection to hiring a real estate agent.

56. By email dated June 22, 2020, Ms. Jean responded that "It also looks like they have a right to go ahead and sell our house. . . . I am really nervous about all of this."

57. By email dated June 22, 2020, Ms. Kurland advised Ms. Jean, "Please do not worry- you did not do anything wrong.  [Mr. Rosen] is trying to invalidate Jack's judgment lien against your home.  [Mr. Rosen] can sell your home to pay this joint debt however I am hoping to work this out with Mr. Day your Dad's lawyer.  Let me try to resolve this between the parties.  If he does not cooperate we will convert your case to a case under Chapter 13 to protect your home."

58. On June 24, 2020, Ms. Kurland advised Ms. Jean that there was no issue with her earning money after the filing of the bankruptcy case.  Ms. Jean was concerned about money she had earned in connection with a surrogacy contract.  The baby was born after the filing of the bankruptcy and the bulk of her payments received thereafter.  The surrogacy agreement was not disclosed in the Jean's filings.

59. By email dated July 13, 2020, Ms. Kurland advised the Jeans, "I will be in touch with ["Mr. Rosen"] this week and get back to you – if your Dad will not withdraw his Proof of Claim then we will have to convert your case to a Chapter 13."

60. On July 24, 2020, Mr. Rosen filed a Motion for Rule 2004 Examination of Ms. Jean.

61. According to Mr. Rosen, on July 1, 2020, he requested information concerning Ms. Jeans' surrogacy from Ms. Kurland, and then again on July 14, 2020 from Ms. Kurland.  Ms. Kurland failed to advise Ms. Jean of and failed to respond to Mr. Rosen's request.

62. By email dated July 27, 2020, Ms. Jean advised Ms. Kurland that she had received documents from Mr. Rosen regarding the surrogacy.  The documents indicated that Mr. Rosen had tried to reach out to Ms. Kurland twice but had not received a response.  Mr.

Rosen further advised Ms. Jean that she had to appear before him and provide all the checks and contracts about the surrogacy.  Ms. Jean asked Ms. Kurland to "[p]lease advise what I need to do."

63. Ms. Kurland failed to properly advised Ms. Jean what do, schedule Ms. Jean's examination, and timely respond to Mr. Rosen's motion for Ms. Jean's Rule 2004 examination.

64. On July 30, 2020, Mr. Rosen filed a Motion for Rule 2004 Examination of Mr. Jean.

65. According to Mr. Rosen, Mr. Jean owned property located at 4511 Dix Street, N.E., Washington, D.C. which had not been mentioned in the Jeans' Bankruptcy filings.

66. According to Mr. Rosen he requested information regarding Mr. Jean's interest in the property on July 1, 2020 from Ms. Kurland and again on July 14, 2020 from Ms. Kurland, however he received no response.

67. On July 23, 2020, Ms. Kurland produced the Operating Agreement of 4511 Dix St LLC.

68. Ms. Kurland failed to properly advised Mr. Jean what to do, schedule Mr. Jean's examination, and timely respond to Mr. Rosen's motion for Ms. Jean's Rule 2004 examination.

69. On August 11, 2020, the Court granted the motion to take the examination of Ms. Jean.

70. On August 18, 2020, the Court granted the motion to take the examination of Mr. Jean.

71. By email dated August 20, 2020, Ms. Kurland advised Mr. Day, counsel for Mr. Fisher, that the most he would get if Mr. Rosen sold the Jeans' home was $22,859.61.

72. Ms. Kurland's calculation was based upon the below market price of the Jeans' home.

73. By email dated August 24, 2020, Mr. Rosen advised Mr. Kurland that if he did not hear back from her regarding the 2004 examination dates by August 26, 2020, he would file a motion to compel.

74. Ms. Kurland failed to contact the Jeans to schedule their examinations.

75. On September 8, 2020, Mr. Rosen filed a motion to compel the attendance of the Jeans at their 2004 examinations.

76. According to Mr. Rosen, on August 11, 2020, he sent an email to Ms. Kurland "asking for dates and times that were convenient for the 2004 examination of [Ms. Jean]." Mr. Rosen sent a reminder to Ms. Kurland on August 18, 2020, "having received no response to [his] previous email."

77. According to Mr. Rosen, "[o]n August 24, 2020 a reminder email was sent to [Ms. Kurland] stating that no response had been forthcoming regarding [Ms. Jean's] or [Mr. Jean's] 2004 examinations."

78. According to Mr. Rosen, "[o]n August 27, 2020, Ms. Kurland forwarded an email stating 'please provide me with dates for a deposition.' Later that day [Mr. Rosen] responded that anytime during the week of September 7th he would be available, with the documents requested to be delivered three days before. Having not had a response to his August 27, 2020 email, on September 1, 2020, [Mr. Rosen] sent another email to [Ms. Kurland], stating 'I haven't heard back on the proposed dates for the depositions. Your clients have an obligation to cooperate with me. They are not. In fact, they are acting in bad faith. It is not difficult to come up with dates that work for an examination.'"

79. Ms. Kurland failed to advise the Jeans that Mr. Rosen had filed a motion to compel.

80. Ms. Kurland had failed to communicate the substance and significance of Mr. Rosen's allegations, especially his allegations that the Jeans were acting in bad faith

81. Ms. Kurland failed to schedule the Jeans' examinations.

82. By email dated September 15, 2020, Ms. Kurland advised Ms. Jean that she was going to ask the Court to convert to a Chapter 13.

83. By email dated September 22, 2020, Ms. Kurland advised Mr. Rosen that she had a proposal to settle the Jeans' case.

84. By email dated September 22, 2020, Mr. Rosen advised Ms. Kurland to "please put any settlement offer in writing."

85. By email dated September 22, 2020, Ms. Kurland stated that she was "[f]ollowing up on my email below wanting to discuss settlement of your claims.  Kindly give me a call."

86. By email dated September 24, 2020 to Mr. Rosen, Ms. Kurland stated: "[f]ollowing up on my email below wanting to discuss settlement of your claims in the Jean case."

87. Ms. Kurland failed timely to file a response to Mr. Rosen's motion to compel attendance at a 2004 examination.

88. On September 29, 2020, the Court granted Mr. Rosen's order to compel.

89. Ms. Kurland failed to advise the Jeans that the Court had granted Mr. Rosen's motion to compel.

90. By email dated October 6, 2020, Ms. Kurland advised Mr. Rosen, "[t]his is my third email to you to request a conversation with you about this case.  An order was entered compelling a deposition but I am unable to schedule anything with you unless you return a call or respond to my email message."

91. Ms. Kurland failed to explain to Mr. Rosen why she was "unable to schedule anything with [him] unless [he] return[ed] a call or respond[ed] to my email message."

92. By email dated October 6, 2020, Mr. Rosen alleged that "[the Jeans] have willfully refused to cooperate with me . . . Please provide me with dates for the 2004 exams.  Please note, you

have never given me any prospective dates and times even though I have been asking for almost two months."

93. Ms. Kurland failed to communicate the substance and significance of Mr. Rosen's email, specifically his allegations that the Jeans "have willfully refused to cooperate with me."

94. Ms. Kurland failed to schedule the Jeans' examinations.

95. By email dated October 19, 2020, Mr. Rosen wrote to Ms. Kurland: "It's not rocket science. I need dates and times that your clients are available for court ordered 2004 exams. I've been asking for two months. If you don't provide me with dates and times by the close of business tomorrow, October 20, I will file a motion under Rule 2005 to have them apprehended and brought before the Court. I am not discussing any settlement prior to the 2004 exams of your clients."

96. Ms. Kurland failed to communicate the substance and significance of Mr. Rosen's October 19, 2020 email.

97. Ms. Kurland failed to schedule the Jeans' examinations.

98. On October 21, 2020, Mr. Rosen filed a motion for apprehension and removal of the Jeans to compel attendance for examination. According to Mr. Rosen, despite repeated requests, he had not been given dates or times by Ms. Kurland to take the 2004 examinations of the Jeans.

99. Mr. Rosen asked that the Court to order the Marshal or other officer to bring the Jeans before the Court to be investigated by Mr. Rosen.

100. Attached to Mr. Rosen's motion for apprehension were emails dated August 18, 2020, August 24, 2020, August 27, 2020, September 1, 2020, September 22, 2020, September 24, 2020, October 6, 2020, and October 19, 2020.

101. Ms. Kurland failed to file a timely response to Mr. Rosen's motion.

102.    On October 27, 2020, the Court entered an order that the Jeans show cause why the court
should not enter an order providing for their apprehension and removal to compel attendance
for examination as ordered by the Court.

103.    Ms. Kurland failed to advise the Jeans that the Court had entered a show cause order.

104.    On October 29, 2020, Ms. Kurland filed a two page response to the Court's order to show
cause.  Ms. Kurland asserted that she, the Jeans, and Mr. Rosen "has (sic) scheduled at (sic)
time to appear via zoom at (sic) on dates certain."  Upon information and belief, there is no
documentation to support this assertion.

105.    On November 3, 2020, Mr. Rosen filed a renewed motion to employ a real estate agent to
sell the Jeans' home.

106.    On November 5, 2020, more than fifty (50) days after her September 15, 2020 email and
288 days after the petition date, Ms. Kurland filed a motion to convert the Jeans' bankruptcy
to a Chapter 13.

107.    In response thereto, Mr. Rosen filed notice of his intent to object to the conversion to
Chapter 13.

108.    On November 13, 2020, Mr. Rosen filed a motion to employ counsel, which was granted,
without opposition, on December 4, 2020.

109.    On November 19, 2020, Mr. Rosen filed an opposition to the motion to convert to a
Chapter 13.  Mr. Rosen's primary argument was that the Jeans failed to cooperate or act in
good faith.

110.    On December 9, 2020, Ms. Kurland filed in a single document containing (i) a motion to
remove Mr. Rosen as trustee, (ii) an objection to employ real estate agent, and (iii) a response
to Mr. Rosen's opposition to the Jeans' motion to convert to Chapter 13.

111.    Mr. Kurland did not discuss the December 9, 2020 filing with the Jeans.

112.    Notwithstanding Ms. Kurland's monumental failings up to this point, she inexplicably stated: "By refusing to cooperate with counsel to resolve the matters of the case, by way of not entertaining any other possible resolution other than selling the Jeans' home, Mr. Rosen is fragrantly (sic) disregarding his professional duties for his own benefit."

113.    On December 10, 2020, Ms. Kurland filed a motion to vacate the order granting Mr. Rosen's application for authority to employ counsel.

114.    On December 11, 2020, The Court struck Ms. Kurland's December 9, 2020 filing because her "combination of these documents has created unnecessary confusion."

115.    On December 11, 2020, Ms. Kurland filed (i) a motion to remove Mr. Rosen as trustee, (ii) an objection to employ real estate, and (iii) a response to Mr. Rosen's opposition to the Jeans' motion to convert to Chapter 13.

116.    On December 11, 2020, the Court denied Ms. Kurland's motion to vacate the order granting counsel's application for authority to employ counsel because she failed to assert a legal basis for vacating or reconsidering the order granting Mr. Rosen's application to employ counsel.

117.    On December 15, 2020, the Court held a hearing on the Jeans' motion to convert to Chapter 13.

118.    On December 28, 2020, the Court denied the motion to convert and directed the Jeans to appear for a 2004 examination.

119.    On January 6, 2021, Mr. Rosen filed a motion to modify the order denying the motion to convert and directing the Jeans to appear for 2004 examination on a date selected by Mr. Rosen for purposes of securing discovery from the Jeans.

120.    By email dated January 7, 2021, Mr. Kurland wrote to Ms. Jean: "your case is certainly

on my mind and I'm trying to think through how to resolve it in the best way possible. I had

hoped your Father would be more cooperative.  From what I can see, the Trustee's legal bills

will keep on growing and growing - which is why I was trying to negotiate a settlement with

your Dad and hold the Trustee off on his request for depositions so that if the property was

sold the Trustee and the law firm would be the only ones paid from the sale proceeds. Your

Dad does not seem to understand the allocation of sale proceeds in bankruptcy situation and

neither does his attorney.  Give me a few days to think of a Plan B . . ."

121.    On January 26, 2021, Ms. Kurland untimely filed an opposition to Mr. Rosen's motion.

122.    On January 26, 2021, the Court granted Mr. Rosen's motion and ordered that the Jeans

produce to Mr. Rosen by February 5, 2021 all of those documents he identified or described

in the Schedule of Documents Requested to be Produced.

123.    On February 5, 2021, the Court entered and order authorizing the hiring of a real estate

agent.

124.    Defendants failed to produce documents by February 5, 2021.

125.    On February 7, 2021, Ms. Kurland filed amended summary of assets and liabilities,

Amended Schedules, and an amended statement of financial affairs on behalf of the Jeans.

126.    By email, Mr. Rosen stated that he belatedly received the Jeans' document production on

February 9, 2021.  Ms. Kurland failed to produce certain documents because she asserted that

"information/documents beyond the date of the Petition is outside the scope of the instant

bankruptcy case and/or not relevant."

127.    By email dated February 11, 2021, counsel for Mr. Rosen advised Ms. Kurland that because her responses to the document requests were late, the Jeans had waived all rights to object.  He also stated that the requested documents were relevant and discoverable.

128.    On February 15, 2021, Mr. Rosen filed a motion to compel the Jeans to obey the court order commanding production of documents.  Mr. Rosen also asked for sanctions.

129.    On February 16, 2021, Mr. Rosen filed an amended emergency motion to compel.

130.    On February 17, 2021, the Court orally granted Mr. Rosen's renewed application to employ a real estate agent, which was subject to the agreement of the parties that the Jeans' home would not be listed for sale prior to April 15, 2021.

131.    On February 19, 2021, Ms. Kurland withdrew the motion to remove Mr. Rosen.

132.    On February 25, 2021, Mr. Rosen issued two amended notices to take remote rule 2004 examinations, one for Mr. Jean and one for Ms. Jean.

133.    On March 5, 2021, the Court entered an order granting Mr. Rosen's unopposed emergency order to compel the Jeans to obey the court order commanding production of documents and for sanctions.  The Court ordered the Jeans to produce all documents withheld from their production to Mr. Rosen's counsel within 48 hours of the Court's order.

134.    The Court's March 5, 2021 also ordered that the Jeans and Ms. Kurland to reimburse Mr. Rosen his reasonable attorney's fees incurred in pursuing his motion.

135.    On March 12, 2021, Mr. Rosen's counsel submitted a petition for attorney's fees.

136.    On March 31, 2021, the court entered an order awarding attorney's fees to Mr. Rosen's counsel against the Jeans and Ms. Kurland in the amount of $4,800.00, to be paid within 14 days of the date of the Order.

137.    Ms. Kurland failed to advise the Jeans that the Court had entered an order requiring the Jeans and Ms. Kurland to pay within 14 days of the date of the order Mr. Rosen's attorney's fees in the amount of $4,800.

138.    On April 9, 2021, Ms. Kurland filed a motion to reconsider the Court's March 5, 2021 order granting Mr. Rosen's unopposed emergency motion to compel and for sanctions.

139.    In her motion, Ms. Kurland states that under the rules, the Court is to consider, among other things, whether the debtor should be penalized for mistakes of their counsel.

140.    Ms. Kurland also stated that the "deadline to defend and file an objection to such motion was accidently overlooked and unintentionally missed in the mounds of emails received by [her] office."

141.    On April 14, 2021, the Court denied Ms. Kurland's motion stating that "Movant has not asserted a legal basis for vacating or reconsidering the Order. . ."

142.    On April 16, 2021, Ms. Kurland filed a second motion to reconsider the order granting Mr. Rosen's emergency motion.  Ms. Kurland admits in her second motion to not knowing about Mr. Rosen's emergency motion.

143.    On April 15, 2021, the real estate agent authorized by the Court to list the property visited the Jeans' home.  The Jeans were given no warning by Ms. Kurland that this was to occur.

144.    The visit was incredibly disruptive to the Jeans and their family.

145.    On April 16, 2021, the Court entered an order striking Ms. Kurland's objection to Mr. Rosen's amended emergency motion, which objection the Court found to be "filed more than a month after the expiration of the objection period and the Court's entry of the Order."

146.    On April 19, 2021, Mr. Rosen filed a motion to hold the Jeans and Ms. Kurland in contempt for failing to obey the Court's order to impose appropriate sanctions to coerce

compliance.  Mr. Rosen filed the motion because neither the Jeans nor Ms. Kurland had paid Mr. Rosen's attorney's fees.

147.    On April 19, 2021, the Court denied Ms. Kurland's second motion to reconsider.

148.    On April 26, 2021, Mr. Rosen filed a motion for approval of the proposed sale of the Jeans' home.

149.    On April 27, 2021, Mr. Rosen filed a motion to compel the Jeans to allow immediate access to their home.

150.    On May 5, 2021, Ms. Kurland filed a response to Mr. Rosen's emergency motion to compel immediate access.  In her motion, Ms. Kurland asserts that Mr. Rosen "has refused to cooperate in settlement negotiations or delay marketing the home.  Instead [Mr. Rosen's] sole focus has been attempting to sell Debtors home . . ."

151.    On May 11, 2021, Mr. Rosen filed a reply to Ms. Kurland's response.

152.    On May 13, 2021, the Court granted Mr. Rosen's motion for immediate access to the Jeans' home.

153.    On May 17, 2021, Ms. Kurland filed an objection to Mr. Rosen's motion for approval of the proposed sale of the Jeans' home.  In her objection, Ms. Kurland stated, "Tomorrow, [the Jeans] intend to submit a significant and substantive formal settlement agreement to [Mr. Rosen"].

154.    Ms. Kurland stated that "as a gesture of goodwill, [the Jeans] have agreed to pay [Mr. Rosen's] legal fees ordered by this Court . . ."

155.    Notwithstanding that Ms. Kurland had admitted in her filings that the failures were hers, she required the Jeans to pay the $4,800 sanction.

156.    On June 2, 2021, the Court granted Mr. Rosen's motion for approval of the sale of the

Jeans' home.

157.    The house sold for $900,000, a loss to the Jeans of more than $350,000 in equity.

158.    The Jeans and their children lost their home.

159.    In addition, Defendants lost all of their clothing, baby toys, and valuable memorabilia

which were left in the house and which Mr. Rosen sold at auction.

160.    On June 15, 2021, Ms. Kurland filed a request for compensation for services rendered.

161.    Ms. Kurland withdrew her appearance and was replaced by Attorney John Burns ("Mr.

Burns").

162.    After her withdrawal, Ms. Kurland communicated with the Jeans for payment of fees.

163.    In connection therewith, Mr. Burns requested the Jeans' file from Ms. Kurland.

164.    Defendants delivered documents without indexing or bate stamping and were delivered to

Mr. Burns in several random piles and by drop box on June 18, 2021.

165.    Ms. Kurland emailed Mr. Burns asking about payment of what was owed to Defendants

from the Jeans.  Mr. Burns asked Defendants for the amount of fees paid by the Jeans and the

justification for such fees.

166.    Mr. Burns made repeated requests for a signed retainer agreement and invoices. An

unsigned retainer was sent dated January 13, 2020 for Chapter 13 retention with inapposite

terms to the representation commenced.  Various invoices were received which were never

received by the Jeans and which were incompatible with the events which had transpired.

167.    Due to Defendants failure to respond to the specific requests, Mr. Burns had to file a

motion to resolve retainer agreement and matters and accounting relative to prior counsel.

168.    In connection with his representation of the Jeans, Mr. Burns has charged in excess

$100,000.

COUNT I
(Professional Negligence – Ms. Kurland)

169.    Plaintiffs  incorporate each of the foregoing paragraphs as if set forth fully in this Count.

170.    The Jeans advised Ms. Kurland that the most important goal was to keep their home.

171.    Standards of care prevail under which Ms. Kurland is required to practice law.

172.    Ms. Kurland breached the duty of care owed to Plaintiffs when she advised the Jeans to

file bankruptcy because it was not an appropriate remedy given their financial situation.

173.    Ms. Kurland breached the duty of care owed to Plaintiffs when she filed the bankruptcy

petition too early.

174.    Had Ms. Kurland waited until June 8, 2020 to file the petition, Mr. Fisher's judgment lien

would have been non avoidable and the Jeans' home could not have been sold by the Trustee.

175.    Ms. Kurland breached the standard of care owed to Plaintiffs when she filed a Chapter 7

bankruptcy for the Jeans when she should have filed a Chapter 13 bankruptcy for the Jeans.

Had Ms. Kurland filed a Chapter 13 bankruptcy for the Jeans, the Jeans would not have lost

their home.

176.    Ms. Kurland breached the standard of care owed to Plaintiffs when she used a real estate

agent with whom she had worked and had financial arrangements to evaluate the value of the

Jeans' home instead of using an independent appraiser.  Upon information and belief, an

independent appraisal would have revealed the significant equity in the Jeans home and

mandated a filing under Chapter 13.

177.    Ms. Kurland breached the standard of care owned to Plaintiffs when she failed to discuss

with the Jeans the benefits and risks of filing for a Chapter 7 versus a Chapter 13.

178.   Ms. Kurland breached the standard of care owed to Plaintiffs when she failed to carefully review the Jeans' financial data in greater detail before filing the Jeans' bankruptcy. Ms. Kurland only met with the Jeans once before filing their petition.

179.   Ms. Kurland breached the standard of care owed to Plaintiffs when she failed to timely convert from a Chapter 7 to a Chapter 13, especially when it became apparent that Mr. Rosen was going to avoid the lien of Mr. Fisher and pursue a sale of the home to pay joint unsecured creditors. Mr. Rosen even suggested to Ms. Kurland that if she did not like the way he was proceeding, she could move to convert.

180.   Ms. Kurland breached the standard of care owed to Plaintiffs when she failed to advise the Jeans that Mr. Rosen was seeking to take their 2004 examinations.

181.   Ms. Kurland breached the standard of care owed to Plaintiffs when she failed to timely schedule the Jeans' 2004 examinations.

182.   Ms. Kurland breached the standard of care owed to Plaintiffs when she failed to discuss with the Jeans that Mr. Rosen was accusing the Jeans of failing to cooperate and act in good faith.

183.   Ms. Kurland breached the standard of care owed to Plaintiffs when she substituted her judgment for that of her clients and made certain decisions, such as failing to make the Jeans available for their 2004 examination, attempting to coerce Mr. Rosen into settling with the Jeans, and filing a motion to remove Mr. Rosen, a person with forty years' experience, as trustee with unsubstantiated allegations of wrongdoing and bad faith.

184.   Ms. Kurland breached the standard of care owed to Plaintiffs when she filed a motion to remove Mr. Rosen when there was no legal or factual basis for such filing.

185.    Ms. Kurland breached the standard of care owed to Plaintiffs when she failed to file or timely file responses to Mr. Rosen's motions, including his request for sanctions.

186.    Ms. Kurland breached the standard of care owed to Plaintiffs when she failed to file or timely file substantive responses to Mr. Rosen's motions, including his request for sanctions.

187.    Ms. Kurland breached the standard of care owed to Plaintiffs when she failed to notify the Jeans of their deadline to produce documents.

188.    Ms. Kurland breached the standard of care owed to Plaintiffs when she continuously failed to timely advise the Jeans of the substance and significance of Mr. Rosen's communications with Ms. Kurland.

189.    Ms. Kurland breached the standard of care owed to Plaintiffs when she continuously failed to timely and properly address the issues raised by Mr. Rosen and advise the Jeans on how to best protect their interests in response thereto.

190.    Ms. Kurland breached the standard of care owed to Plaintiffs when she charged an unlawful and unreasonable fee for her services.

191.    Ms. Kurland breached the standard of care owed to Plaintiffs when she failed to disclose the conflict of interests as it related to her pre-petition and post-petition attorney's fees.

192.    Ms. Kurland breached the standard of care owed to Plaintiffs when she required the Jeans to pay the $4,800 in sanctions, which were caused by her own neglect.

193.    Ms. Kurland breached the standard of care owed to Plaintiffs when she failed to deliver to Mr. Burns an organized file and respond to his request for a signed engagement agreement and invoices/statements.

194.    As a result of Ms. Kurland's negligence, the Jeans and their family lost their home.

195.   The fees paid to Mr. Burns were directly the result of the Ms. Kurland's negligent conduct.

196.   As a result of Ms. Kurland's negligence, the Jeans paid to the Trustee $4,800.

197.   As a result of Ms. Kurland's negligence, the Estate unnecessarily incurred substantial legal fees.

WHEREFORE, Plaintiffs demand judgment against Ms. Kurland in an amount that exceeds $75,000, plus prejudgment interest, costs, and any other relief the Court deems appropriate and just.

COUNT II
(Professional Negligence – the Firm)

198.   Plaintiffs incorporate each of the foregoing paragraphs as if set forth fully in this Count.

199.   Standards of care prevail under which the Firm is required to practice law.

200.   The Firm breached the standard of care owed to Plaintiffs when, through its agents and employees, including but not limited to Ms. Kurland, it advised the Jeans to file bankruptcy when it was not an appropriate remedy given their financial situation.

201.   The Firm breached the standard of care owed to Plaintiffs when, through its agents and employees, including but not limited to Ms. Kurland, it filed their bankruptcy petition too early.

202.   Had the Firm waited until June 8, 2020 to file the petition, Mr. Fisher's judgment lien would have been non avoidable and the Jeans' home could not have been sold by the Trustee.

203.   The Firm breached the standard of care owed to Plaintiffs when, through its agents and employees, including but not limited to Ms. Kurland, it filed a Chapter 7 bankruptcy for the Jeans when the Firm  should have filed a Chapter 13 bankruptcy for the Jeans.  Had the Firm filed a Chapter 13 bankruptcy for the Jeans, the Jeans would not have lost their home.

204.    The Firm breached the standard of care owed to Plaintiffs when, through its agents and employees, including but not limited to Ms. Kurland, it used a real estate agent with whom she had worked and had financial arrangements to evaluate the value of the Jeans' home instead of using an independent appraiser.  Upon information and belief, an independent appraisal would have revealed the significant equity in the Jeans home and mandated a filing under Chapter 13.

205.    The Firm breached the standard of care owed to Plaintiffs when, through its agents and employees, including but not limited to Ms. Kurland, it failed to discuss with the Jeans the benefits and risks of filing for a Chapter 7 versus a Chapter 13.

206.    The Firm breached the standard of care owed to Plaintiffs when, through its agents and employees, including but not limited to Ms. Kurland, it failed to carefully review the Jeans' financial data in greater detail before filing the Jeans' bankruptcy.  Ms. Kurland only met with the Jeans once before filing their petition.

207.    The Firm breached the standard of care owed to Plaintiffs when, through its agents and employees, including but not limited to Ms. Kurland, it failed to timely convert from a Chapter 7 to a Chapter 13, especially when it became apparent that Mr. Rosen was going to avoid the lien of Mr. Fisher and pursue a sale of the home to pay joint unsecured creditors. Mr. Rosen even suggested to Ms. Kurland that if she did not like the way he was proceeding, she could move to convert.

208.    The Firm breached the standard of care owed to Plaintiffs when, through its agents and employees, including but not limited to Ms. Kurland, it failed to advise the Jeans that Mr. Rosen was seeking to take their 2004 examinations.

209.    The Firm breached the standard of care owed to Plaintiffs when, through its agents and employees, including but not limited to Ms. Kurland, it failed to timely schedule the Jeans' 2004 examinations.

210.    The Firm breached the standard of care owed to Plaintiffs when, through its agents and employees, including but not limited to Ms. Kurland, it failed to discuss with the Jeans that Mr. Rosen was accusing the Jeans of failing to cooperate and act in good faith.

211.    The Firm breached the standard of care owed to Plaintiffs when, through its agents and employees, including but not limited to Ms. Kurland, it substituted her judgment for that of her clients when she made certain decisions, such as failing to make the Jeans available for their 2004 examination, attempting to coerce Mr. Rosen into settling with the Jeans, and filing a motion to remove Mr. Rosen, a person with forty years' experience, as trustee with unsubstantiated allegations of wrongdoing and bad faith.

212.    The Firm breached the standard of care owed to Plaintiffs when, through its agents and employees, including but not limited to Ms. Kurland, it filed a motion to remove Mr. Rosen when there was no legal or factual basis for such filing.

213.    The Firm breached the standard of care owed to Plaintiffs when, through its agents and employees, including but not limited to Ms. Kurland, it failed to file or timely file responses to Mr. Rosen's motions, including his request for sanctions.

214.    The Firm breached the standard of care owed to Plaintiffs when, through its agents and employees, including but not limited to Ms. Kurland, it failed to file or timely file substantive responses to Mr. Rosen's motions, including his request for sanctions.

215.    The Firm breached the standard of care owed to Plaintiffs when, through its agents and employees, including but not limited to Ms. Kurland, it failed to notify the Jeans of their deadline to produce documents.

216.    Ms. Kurland breached the standard when she continuously failed to timely advise the Jeans of the substance and significance of Mr. Rosen's communications with Ms. Kurland.

217.    Ms. Kurland breached the standard when she continuously failed to timely and properly address the issues raised by Mr. Rosen and advise the Jeans on how to best protect their interests in response thereto.

218.    The Firm breached the standard of care owed to Plaintiffs when, through its agents and employees, including but not limited to Ms. Kurland, it charged an unlawful and unreasonable fee for her services.

219.    The Firm breached the standard of care owed to Plaintiffs when, through its agents and employees, including but not limited to Ms. Kurland, it failed to disclose the conflict of interests as it related to her pre-petition and post-petition attorney's fees.

220.    The Firm breached the standard of care owed to Plaintiffs when, through its agents and employees, including but not limited to Ms. Kurland, it required the Jeans to pay the $4,800 in sanctions, which were caused by her own neglect.

221.    The Firm breached the standard of care owed to Plaintiffs when, through its agents and employees, including but not limited to Ms. Kurland, it failed to deliver to Mr. Burns an organized file and response to his for a signed engagement agreement and invoices/statements.

222.    As a result of the Firm's negligence, the Jeans and their family lost their home.

223.    The fees paid to Mr. Burns were directly the result of the Firm's negligent conduct.

224.    As a result of the Firm's negligence, the Jeans paid to the Trustee $4,800.

225.    As a result of the Firm's negligence, the Estate incurred substantial legal fees and

expenses.

WHEREFORE, Plaintiffs demand judgment against Ms. Kurland in an amount that

exceeds $75,000, plus prejudgment interest, costs, and any other relief the Court deems

appropriate and just.

/s/ *Thomas O'Toole*
Thomas O'Toole (10227)
totoolelaw@aol.com
Neal C. Baroody (04536)
201 N. Charles Street, Suite 2102
Baltimore, Maryland 21201
Phone (410) 539-8410
Fax (410) 539-8411
Attorneys for Plaintiffs